UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| KARIN MARTIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>NEWELL BRANDS INC. and SUNBEAM PRODUCTS, INC.,<br><br>Defendants. | Case No. |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff Karen Martin ("Plaintiff" or "Ms. Martin"), on behalf of herself and all others similarly situated, by and through her undersigned counsel, brings this class action complaint against Defendants Newell Brands Inc. and Sunbeam Products, Inc. (together, "Defendants"). Plaintiff Martin alleges the following based upon personal knowledge as to allegations specifically pertaining to herself, and based upon information, belief, and the investigation of counsel as to all other allegations.

## **INTRODUCTION**

1.     On September 25, 2025, the U.S. Consumer Product Safety Commission ("CPSC") announced the recall (the "Recall") of approximately 1.29 million Oster French Door Countertop Ovens imported and distributed by Defendant Sunbeam Products, Inc., with model numbers TSSTTVFDXL, TSSTTVFDDG, TSSTTVFDMAF, and TSSTTVFDDAF (the "Defective Products," "Oven," or "Ovens").[1]

2.     Defendants marketed, sold, and delivered each of these Ovens to consumers with an identical defect: defective spring-loaded, front-open doors (the "Safety Defect"). The spring-loaded hinges in these doors fail to securely hold the

---

[1]   *See* U.S. Consumer Product Safety Commission, *Sunbeam Products Recalls More than One Million Oster French Door Countertop Ovens Due to Burn Hazard*, Recall No. 25-475, https://www.cpsc.gov/Recalls/2025/Sunbeam-Products-Recalls-More-than-One-Million-Oster-French-Door-Countertop-Ovens-Due-to-Burn-Hazard (last visited Oct. 10, 2025).

doors open and snap shut, causing the doors to close unexpectedly, burning consumers during ordinary use. The Safety Defect causes the doors to get stuck, prevents them from opening partially, and has characteristics that can cause the doors to break and shatter, melt, or even explode. The Safety Defect renders the Ovens unusable and unfit for their intended purpose – cooking.

3.      Defendants have known of the Safety Defect since at least 2022, but they failed to disclose the Safety Defect to consumers.

4.      This Safety Defect, which Defendants have only now acknowledged through the Recall, creates a risk of injury and poses a fire hazard for users of the Defective Products, making them unusable and valueless.

5.      The Safety Defect existed at the time that the Ovens left Defendants' possession and control, but did not manifest until users, like Plaintiff, experienced door malfunctions while using the Ovens.

6.      Defendants sold the 1.29 million Defective Products nationwide on their own website, through major retailers like Costco, Best Buy, Walmart, and Bed Bath & Beyond, and through online retailers like Amazon, from August 2015 through July 2025.

7.      Plaintiff seeks damages, equitable, and injunctive relief due to the Safety Defect in the Ovens, as well as Defendants' unlawful conduct in concealing the Safety Defect, failing to cure the Safety Defect, and or failing to adequately

compensate Plaintiff and the Class members for the economic harm they have suffered as a result of the Safety Defect.

8.      Plaintiff and other Class members reasonably expected the Ovens to be safe and not pose a danger, fire hazard, or risk of injury. Specifically, Plaintiff relied on her expectation that the doors would not get stuck, close abruptly, and forcefully trap her fingers, or break, or shatter, creating a safety risk and rendering her Oven unusable.

9.      The expectation was objectively reasonable. Consumers select and purchase specific appliances for reliable and safe use in their homes and businesses. Moreover, counter-top ovens have become increasingly popular due to their perceived convenience, versatility, and health-conscious attributes.[2] If any of these attributes are compromised, or worse, overridden by safety concerns, the Oven is then unreasonably dangerous and unfit for its intended purpose.

10.     Indeed, the importance of product safety is widely understood as "[r]egulations in the North American small kitchen appliances industry primarily focus on safety standards, energy efficiency, and environmental impact. Agencies

---

[2] Grand View Research, *Countertop Oven Market Size & Trends*, https://www.grandviewresearch.com/industry-analysis/countertop-oven-market-report (last visited Oct. 12, 2025).

like the CPSC and the Environmental Protection Agency ("EPA") set stringent guidelines to ensure product safety."[3]

11.     Recognizing the importance of both safety and convenience to consumers, Defendants touted the Ovens' convenience and ease of use but knowingly omitted crucial details regarding the Safety Defect. On its website, Sunbeam presents the Ovens as having "[e]legant French Doors [that] open with a single pull, making inserting and removing meals easy and convenient."[4] *See* Figure 1 below.



*Figure 1: Image from Defendants' website showing the Oster Countertop Oven, advertising as easy to open with a single pull for easy access.*

---

[3]   Grand View Research, *North America Small Kitchen Appliances Market (2024 - 2030)*, https://www.grandviewresearch.com/industry-analysis/north-america-small-kitchen-appliances-market-report (last visited Oct. 12, 2025).

[4]   Oster®,  *Oster®  Manual  French  Door  Air  Fry  Oven*, https://www.oster.com/cooking-appliances/countertop-ovens/oster-manual-french-door-air-fry-oven/SAP_2142004.html (last visited Oct. 10, 2025).

12.     In the product manual for the Ovens, Defendants represent that they "hold rigorous standards in product design and testing."[5] They list at least 23 safety precautions that users should follow, none of which disclose or relate to the Safety Defect.[6] According to available information, neither the product manual, the box, nor the advertising for the Defective Products mention or warn users about the risk of the spring-loaded French door mechanism snapping shut.

13.     In a marketing video, Oster exhibits the French-door mechanism and presents it as "really cool, both doors open at once, that's a great idea."[7] The advertisement's endorsement of the French door design, while demonstrating in-home use and close-hand interaction with the appliance, provides a message of convenience, safety, and ease of use. Notably, the advertisement makes no mention of any risks associated with the French door feature and omits any disclosure that the doors may suddenly and forcefully close on a user's fingers or hands or inexplicably shatter – a material hazard Sunbeam now acknowledges in its Recall.

---

[5]   U.S. Sunbeam Products / Oster, *User Manual: Oster French Door Air Fry Countertop Oven* (Model TSSTTVFDMAF) (Nov. 11, 2020), https://s7d9.scene7.com/is/content/NewellRubbermaid/TSSTTVFDMAF_Grover_IB, at 2.

[6]   *Id*.

[7]   *See* Oster®, *French Door Manual Oven Unboxing |Oster®* at 0:48 (YouTube Oct. 5, 2016), https://www.youtube.com/watch?v=3NMtSMNkhp8.

14.     Specifically, Defendants acknowledged in the Recall that "the [Oven's] doors can close on consumers, posing a burn hazard."[8]

15.     And in its notice of recall, the CPSC instructed consumers to "immediately stop using the recalled countertop ovens,"[9] demonstrating that the Ovens are unreasonably unsafe and dangerous and not suitable for personal/household use, which is their principal and intended purpose.

16.     Thus, Sunbeam's representations that the Oven's French doors made inserting and removing food from the Oven "easy and convenient" were false and misleading. Indeed, Sunbeam's representations about the Oven's ease of use omitted the Safety Defect and led consumers to believe that the "French doors" would be easy to use, rather than dangerous and defective. But by Sunbeam's own admission, the Safety Defect causes the doors to malfunction and snap shut and renders the Ovens unusable (and certainly not easy or convenient).

17.     Defendants were aware and knew of the Safety Defect for years prior to the recall, as various customers publicly posted negative reviews on Defendants' website regarding the danger the doors posed well before the recall. A year ago, one such customer wrote, "I have been burned several times by the doors closing while

---

[8]     Oster®, *Voluntary Recall: Oster French Door Countertop Oven*, https://recall.oster.com/ (last visited Oct. 11, 2025).

[9]     U.S. Consumer Product Safety Comm'n, *supra* note 1.

I am removing the food. This appliance sucks. Don't waste your money!!!"[10] Oster Consumer Care acknowledged and replied to the review.[11]

18.     Consumers complained to Sunbeam that the Oven doors were "closing" unexpectedly and burning users during ordinary use point to the same hazard that Defendants have now admitted in the Recall. Defendants' responses to those consumer complaints indicate that Defendants had actual (not merely constructive) knowledge of the inherent dangers with their Defective Product for years. Yet they continued to market, sell, and distribute the Ovens as convenient and easy to use – without disclosing the Safety Defect. *See* Figure 2 below.



*Figure 2: Oster review by "Another dissatisfied"[12]*

---

[10] Oster®     Manual     French     Door     Air     Fry     Oven,     *Reviews*, https://www.oster.com/cooking-appliances/countertop-ovens/oster-manual-french-door-air-fry-oven/SAP_2142004.html (last visited Oct. 12, 2025).

[11]  *Id.*

[12]  *Id.*

19.     Notably, Defendants received reviews expressing users' safety concerns at least ***four years ago*** or earlier. In one such review JackieB0327 writes: "Today, when she (her mother) was using it, one of the glass doors ***exploded*** and there were shards of glass all over her kitchen. . . . She could have been ***seriously hurt***."[13]   Sunbeam acknowledged receipt of the review and claimed that "Oster products were made with the highest quality and complete materials and we expect them to last." *See* Figure 3 below.



*Figure 3: Oster Review by "JackieB0327"*

20.     Defendants have been aware of the Safety Defect in their Ovens for years, but they have repeatedly failed to remedy the problem or to disclose the danger to consumers. Instead, Defendants concealed the Safety Defect from Plaintiff, Class

---

[13] Oster®     Manual     French     Door     Air     Fry     Oven,     *Reviews*, https://www.oster.com/cooking-appliances/countertop-ovens/oster-manual-french-door-air-fry-oven/SAP_2142004.html (last visited Oct. 15, 2025) (emphasis added).

members, and the public while continuing to market and advertise the Ovens as "easy and convenient," when the Ovens were dangerous and unusable.

21. Defendants received and acknowledged customer complaints about the Ovens and the Safety Defect, yet they failed to take steps to modify their marketing, labeling, or product packaging materials to include disclosures warning consumers of the risks and dangers associated with the Safety Defect.

22. Defendants had exclusive knowledge of, and had been in possession of information relating to, the Safety Defect, which was material to Plaintiff and Class members. Indeed, Plaintiff and Class members could not reasonably have known about the Safety Defect prior to purchase.

23. The Safety Defect was not and could not be readily discovered by the Plaintiff or Class members prior to use, as the Safety Defect would only become apparent during use of the Defective Product.

24. Defendants' marketing and advertising materials repeatedly referred to the Oven's "elegant French Doors [that] open with a single pull, making it easy to insert and remove food." Defendants' representations misled Plaintiff and Class members to justifiably rely on that the doors would be easy to use and would not get stuck, break, abruptly snap shut on their finger and hands, or pose a risk of injury or fire hazard.

9

25.     Under all circumstances, Defendants had a duty to disclose the Safety Defect to consumers at the point of purchase of the Ovens.

26.     Instead, Defendants not only failed to disclose and warn consumers of the Safety Defect, or the potential burns or injuries they could sustain due to the Safety Defect, but they also failed to provide an effective and timely remedy to cure the Safety Defect and prevent further harm or to refund the purchase price.

27.     Despite Defendants' awareness and knowledge of the Safety Defect, Defendants continued to promote, market, and advertise the Defective Products as "easy and convenient" for in-home use to persuade consumers into buying the Defective Products actively and intentionally. Defendants even developed and provided boilerplate answers to consumer complaints to dispel safety concerns and to bolster their image as "manufactur[er of] high quality products."[14]

28.     Defendants failed to disclose or warn consumers of the Safety Defect in the Ovens, while touting their French door design as enhancing ease and convenience. As a result, Plaintiff and the Class members purchased the Defective Products, which they would not have purchased had they known of the Safety Defect and its related dangers and risks.

29.     As described above, due to the Safety Defect, the Ovens are dangerous as they are prone to suddenly close and trap users' fingers and hands, as well as

---

[14]     *Id.*

10

have their glass doors shatter, potentially causing burns and injuries. The Safety Defect forces consumers to either keep using unsafe Ovens, to pay for and implement repairs, or purchase a new oven. Even repairing the Oven does not eliminate the Safety Defect, leaving consumers with a dangerous and defective product. Therefore, the Safety Defect results in a hazardous condition that renders the Oven unreasonably dangerous, unusable for its intended purpose, and valueless.

30. As a direct and proximate result of Sunbeam's misrepresentations and omissions and concealment of the Safety Defect, Plaintiff and the Class members sustained damages, including: (a) economic losses, as the Ovens are now unusable and valueless; (b) overpayment for the Defective Products because the Safety Defect renders the Ovens unreasonably dangerous and unfit for their intended purpose; (c) lost benefit of their bargain; and (d) replacement costs.

31. Plaintiff and Class members have purchased Ovens that they would otherwise not have purchased had they known of the Safety Defect. Consequently, Plaintiff and Class members have suffered actual damages and ascertainable losses because of Defendants' unlawful conduct.

32. Accordingly, Plaintiff brings this action individually and on behalf of Classes of similarly situated individuals to recover actual and nominal damages, restitution, and other equitable and injunctive relief for: (i) violations of the Ohio Consumer Sales Practices Act, (ii) unjust enrichment, and (iii) negligence.

11

## PARTIES

33.    Plaintiff Karen Martin is a citizen of Cleveland Heights, Ohio who owns one of the Ovens, Model TSSTTVFDDG. Ms. Martin purchased her Oven online from Amazon.com and received delivery of the Oven at her Ohio home. The Oven that Ms. Martin purchased is one of the products at issue in this case.

34.    When Ms. Martin purchased her Oven, she had the impression that the Oven would be easy and convenient to use. However, after receiving and starting to use her Oven, Ms. Martin discovered that the doors of the Oven abruptly slam shut when she lets go of the door handles. and she has stopped using her Oven for fear that she will be burned or injured by the Defective Product due to the Safety Defect.

35.    None of the marketing, packaging materials, or labeling that came with the Oven made any mention or provided a warning of the Safety Defect. The Safety Defect was and is material to Plaintiff. Had Defendants disclosed the Safety Defect on the labeling or product packaging or in any of the marketing materials, Ms. Martin would not have purchased the Oven, would not have purchased the Oven on the same terms, or would have promptly returned the Oven upon noticing a warning or disclosure.

36.    Defendant Sunbeam Products, Inc ("Sunbeam") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Atlanta, Georgia. In 2002, Sunbeam declared chapter 11

12

bankruptcy and emerged from the bankruptcy as American Household Inc., after which its products division became the subsidiary Sunbeam Products, Inc.[15] In 2004, Jarden Corp. purchased American Household Inc. and with it acquired Sunbeam.[16] In 2015, Jarden Corp. was acquired by Newell Rubbermaid, which then rebranded as Newell Brands Inc.[17]

37. Defendant Newell Brands Inc. ("Newell") is a publicly traded corporation organized and existing under the laws of the State of Delaware, with its principal place of business in Atlanta, Georgia. At all relevant times hereto, Newell Brands Inc. (f/k/a/ Newell Rubbermaid Inc.) owned Sunbeam Products, Inc.[18]

---

[15] *Company News; Sunbeam Emerges From Bankruptcy with a New Name,* NY Times, https://www.nytimes.com/2002/12/19/business/company-news-sunbeam-emerges-from-bankruptcy-with-a-new-name.html (last visited Oct. 16, 2025).

[16] *Jarden to Buy American Household for $745 Million,* LA Times (Sept. 21, 2004) https://www.latimes.com/archives/la-xpm-2004-sep-21-fi-jarden21-story.html (last visited Oct. 16, 2025).

[17] Serena Ng and Mark Maremount*, Newell Rubbermaid to Acquire Jarden for $15 Billion*, Wall St. J. (Dec. 14, 2015), https://www.wsj.com/articles/newell-rubbermaid-and-jarden-strike-merger-deal-1450094318; *also* Jim Zarroli, *Newell Rubbermaid Buys Jarden, Uniting Two Big Consumer Brands*, NPR, (Dec. 14, 2015), https://www.npr.org/sections/thetwo-way/2015/12/14/459698219/newell-rubbermaid-buys-jarden-uniting-two-big-consumer-brands (last visited Oct. 15, 2025).

[18] Newell Brands, *Newell Rubbermaid and Jarden Corporation Announce Consumer Goods Combination with $16 Billion Revenue* (Dec. 14, 2015), https://ir.newellbrands.com/news-releases/news-release-details/newell-rubbermaid-and-jarden-corporation-announce-consumer-goods (last visited Oct. 16, 2025).

38. Defendants and/or their agents or alter egos (themselves and through their related business entities) designed, manufactured, advertised, marketed, distributed, warranted, and sold Oster branded consumer small kitchen appliances, including the Defective Products, throughout the United States, including in Ohio. Defendants are responsible for the current product recall issued by the CPSC as related to the Defective Products.

## JURISDICTION AND VENUE

39. This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332(d) because at least one Class member is of diverse citizenship from Defendants, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of costs, fees, and interest.

40. This Court has personal jurisdiction over Defendants because each is registered to do business in Georgia and have their principal place of business in Georgia. Defendants have also purposefully availed themselves of the privilege of conducting their business activities in the Georgia, and a substantial portion of events giving rise to the claims arose in this state.

41. Venue is proper in this District pursuant to 28 U.S.C. §1391 because Defendants reside in and carry on continuous business activities within this District, and because a substantial part of the acts or omissions giving rise to the claims brought herein occurred or emanated from within this District.

## FACTUAL ALLEGATIONS

### A.  Defendants Manufactured, Distributed, Marketed, Advertised, and Sold the Defective Products

42.  All the Defective Products at issue suffer from the same Safety Defect and can be readily identified by their Model through the Recall.

43.  Defendants manufactured, distributed, marketed, advertised, and sold the Defective Products nationwide and in a uniform manner.

44.  Defendants specifically marketed and advertised the Defective Products as being a convenient and easy to use product that would serve as a countertop oven, while affirmatively marketing them as safe, convenient, and omitting and failing to disclose that the Ovens contained a Safety Defect that rendered them unusable for that purpose.

45.  Defendants engaged in marketing efforts to highlight the benefits of the Ovens to consumers to persuade them to purchase the Ovens. Defendants and their retail partners promoted the Ovens in video advertising, including a QVC segment that highlighted the "French door" design as a key benefit – emphasizing that "those doors open wide giving you easy access" for food removal.[19]

---

[19]  QVCtv, *Oster XL Digital Convection Oven w/ French Doors on QVC*, at 4:22 (YouTube Dec. 6, 2017), https://www.youtube.com/watch?v=jqX-Qr18hHo (last visited Oct 11, 2025).

46.     Defendants' own website made affirmative misrepresentations and actionable omissions. It boasts the "Elegant French Doors [which] open with a single pull, making inserting and removing meals easy and convenient," and repeats that the "French doors open with a single pull, making it easy to insert and remove food."[20] *See* Figure 4 below.



*Figure 4: Screenshot from Sunbeam's website displaying the Oster French Door Countertop Oven, Model TSSTTVFDMAF[21]*

---

[20]   Oster®, *Oster® Manual French Door Air Fry Oven*, *supra* note 6.

[21]   Oster®, *Oster Manual French Door Air Fry Oven*, Product Details, https://www.oster.com/cooking-appliances/countertop-ovens/oster-manual-french-door-air-fry-oven/SAP_2142004.html (last visited Oct. 12, 2025).

47. However, nowhere on the page or in the Defective Product's manual do Defendants disclose the material risk that the French doors can abruptly and instantly close and snap shut, burning users and causing the glass to shatter – most critically when a user is inserting or removing hot food – creating a foreseeable risk of danger and burn hazard that renders the Ovens unusable.[22]

48. Defendants sold the Defective Products through their own website at Sunbeam.com and through third party retailers such as QVC, Costco, Bed Bath and Beyond, Walmart, and others nationwide, as well as online at Amazon.com and Overstock.com, from August 2015 through July 2025, for retail prices ranging between $140 and $250.[23] *See* Figure 5 below.



*Figure 5: Screenshot from CPSC's website depicting the Oster French Door Countertop Oven, Model TSSTTVFDMAF*

---

[22] *Id.*

[23] *Supra* note 1.

17

**B.      Defendants' Design of the Defective Products Poses a Danger and Serious Risk to Users That Defendants Were Aware Of**

49.      Defendants' Ovens pose a serious and unreasonable safety risk and burn hazard, as the doors can abruptly close, trapping users' fingers and hands in the Ovens and causing the glass doors to suddenly shatter.

50.      There are close to 100 known incidents to date that have been reported, including multiple burn injuries, including second-degree burns.[24] Consumers purchased or received these Ovens under the belief that they were safe for household use; instead, they have been subjected to a hazardous and unreasonably dangerous product that could result in significant harm and is unfit for its intended purpose.

51.      Ms. Martin can no longer use her oven as she is concerned that the Oven is dangerous and will inflict harm on both her and her property, or anyone else who uses her Oven.

52.      The Ovens were marketed, manufactured, sold, and distributed with doors that did not have secure hinges or adequate holding strength to keep them open, which caused the doors to unexpectedly swing shut during use. Despite this risk, neither the instruction manuals,[25] box labels, packaging, nor online information included any warnings about the dangers posed by the Safety Defect.

---

[24]   *Id.*

[25]   *See* U.S. Sunbeam Products-Oster, *User Manual- French Door Countertop Oven (Model TSSTTVFDXL)*, https://newellbrands.imgix.net/3bafcc15-24c6-3a99-847e-

53. Additionally, the faulty quality of the doors and the doors' mechanisms also caused the glass doors to get stuck, melt, or shatter, leaving users with Ovens that were fire hazards, and were either inoperable because the doors would not close, had melted, or had broken and shattered.

54. At all relevant times, reasonably priced, viable, and safer alternative options were available to Sunbeam in its manufacture of the Oven, including, but not limited to: (a) enhanced magnetic locks to hold the doors either securely open or securely closed; (b) mechanisms to hold the doors at partially open positions; (c) sturdy hinge mechanisms that would prevent the doors from snapping or slamming shut; (d) mechanisms that required dual handle use to avoid one hand operation; (e) heat-insulating or edge-guarding of the glass doors to avoid or minimize contact with hot surfaces; and (f) clear and prominent warning labels on the Ovens, their packaging, and manuals.

55. Defendants were fully aware of the serious door hazard well before the Recall, having received numerous publicly posted consumer reviews raising concerns. For example, a verified purchase review dated April 4, 2024, on Amazon.com, explicitly noted that the French doors had "malfunctioned and

---

d0abe142d180/3bafcc15-24c6-3a99-847e-d0abe142d180.pdf (last visited Oct. 13, 2025).

19

slammed on her arm causing a significant burn."[26]  The review even included a picture of the burns sustained by the Oven's user, underscoring the fact that the Ovens' safety issues were ongoing and unaddressed by Defendants. *See* Figure 6 below.



*Figure 6: Amazon review by "JC"*

56.    On BestBuy.com, a one-star review titled "Not worth it" reports: "Horrible design door gets stuck and finally ***broke and left glass all over my kitchen***."  This on-site complaint – highlighting the same failure of the doors to properly open and close and eventually shattering and leaving broken glass around it – put Defendants and one of Defendants' major retailers on actual notice of a serious Safety Defect that posed an unreasonable danger to consumers and users, while Defendants continued to market and distribute the Defective Products without disclosing the Safety Defect that rendered the Ovens unusable. *See* Figure 7 below.

---

[26]  Amazon, *Oster Extra-Large French Door Toaster Oven, 6-in-1 Countertop Air Fryer Oven, Stainless Steel- Customer Reviews*, https://www.amazon.com/product-reviews/B0C1FSLTY7/ref=cm_cr_arp_d_paging_btm_next_2?ie=UTF8&filterBy Star=one_star&reviewerType=all_reviews&pageNumber=2#reviews-filter-bar (last visited Oct. 12, 2025).



*Figure 7: A review on Best Buy's website titled "Not worth it"[27]*

57.     Another review on Defendants' website mentioned that the doors would fail to function properly or break due to cheap plastic parts and even pose a fire hazard during use.  In that review, George329 wrote: "I found out though, that ***the mechanism that opens the doors is a plastic part, that melted, and burned*** . . .. I imagine, if given the right scenario, this part could easily catch fire and spread easily in a kitchen setting. Called Oster, no answer."[28]  Not only did the doors stop functioning properly, rendering the Oven worthless, but continued use also posed a

---

[27] BestBuy, *Oster - French Door Oven with Convection*, Customer Ratings and Reviews, https://www.bestbuy.com/site/reviews/oster-french-door-oven-with-convection-metallic-charcoal/6426639?variant=A&sort=LOWEST_RATING (last visited Oct. 12, 2025).

[28] Oster® Manual French Door Air Fry Oven, Reviews, https://www.oster.com/cooking-appliances/countertop-ovens/oster-manual-french-door-air-fry-oven/SAP_2142004.html (last visited Oct. 15, 2025).

serious risk of danger to the user and the user's home. Despite receiving and acknowledging receipt of this review, Defendants continued to market and distribute the Defective Products without disclosing the Safety Defect that rendered the Ovens unusable. *See* Figure 8 below.



*Figure 8: Oster review by "George329"[29]*

58.     Another detailed review on July 1, 2023, warned that "the door hinge could be firmer thus preventing the door from slamming shut," and, upon rating the usability of the Oven, the reviewer noted that "the doors cannot open partially and can slam shut if your hand slips."  The reviewer concluded: "Unlike some ovens,

---

[29]  BestBuy, *Oster - French Door Oven with Convection*, Customer Ratings and Reviews,       https://www.oster.com/cooking-appliances/countertop-ovens/oster-manual-french-door-air-fry-oven/SAP_2142004.html (last visited Oct. 14, 2025).

opening the door doesn't stop the oven or the interior light. The oven casing can get very hot after long cooking times at high temperatures, so you should take care."

*See* Figure 9 below.



Unfortunately, we found that the flat buttons often required some force to register (-1). Moreover, the door hinge could be firmer thus preventing the door from slamming shut.

. . .

23

The french door and its cool-touch handle allow you to stay away from the heat wave when opening after cooking (+4). The doors are also single-pull which is very convenient. However, the doors cannot open partially and can slam shut if your hand slips (-2).

Unlike some ovens, opening the door doesn't stop the oven or the interior light (-2). The oven casing can get very hot after long cooking times at high temperatures, so you should take care (-1).

*Figure 9: Should it review on Oster French Door[30]*

59. Via their own website, Defendants were notified at least three years ago that consumers had safety concerns about the Ovens. In a one-star review titled "Tons of potential, but honestly just dangerous," a customer made clear that above all they had "2 issues [that we]re safety-related and the reason [they] would absolutely not recommend this product. The French doors cannot be opened with one hand and must be opened completely on both sides, or they will slam shut on you. Hard to do and super dangerous to attempt when the unit is on."[31] The reviewer further commented that "the unit gets very hot, like burned [her] hand to the point of blistering when [she] accidentally grazed the side of the unit near the back."[32] Again, Defendants acknowledged receipt of the review and expressed their apologies for the consumer's dissatisfaction with the Defective Product. Still,

---

[30] Alan Nguyen, *et al.*, *Oster French Door Toaster Oven In-depth Review*, Should it (July 1, 2023), https://shouldit.com/toaster-ovens/reviews/oster/oster-tssttvfddg/ (last visited Oct. 13, 2025).

[31] *Id.*

[32] *Id.*

Defendants continued to market, distribute, and sell the Defective Product without disclosing the Safety Defect that rendered the Ovens unusable.



*Figure 10: A review on Oster's page titled "Doors . . . will slam shut on you"[33]*

60. Additional reviews on Sunbeam's website reinforced Sunbeam's awareness and knowledge of the danger posed by the Ovens' doors and put Sunbeam on notice that their Defective Product was malfunctioning and posing a danger to its users. Sunbeam responded to the reviews and advised users to discontinue use of the Defective Products, but it continued to market, distribute, and sell the Defective

---

[33] *Id.*

Products without disclosure and while knowing that their continued use posed an unreasonable risk and threatened user safety. *See* Figure 11-13 below.



*Figure 11: Oster Review by "MelC"*



*Figure 12: Oster Review by "Nonu"*



*Figure 13: Oster Review by "JH1029"*

26

61.     Despite numerous reviews all describing the hazards and risks of danger to the Ovens' users, Defendants carried on and continued to manufacture, market, distribute, and sell the Defective Products with the Safety Defect, for at least an additional *four years.*

**C.      Defendants' Deceptive Advertising Campaign Was Aimed at Promoting Safety and Ease-of-Use**

62.     Defendants, directly and with their retail partners, promoted the Ovens as convenient and easy to use as stovetop ovens, creating the impression that the Ovens were fit and safe for such use (when they were not). One QVC segment that highlighted the "French door" design highlighted the Oven's features like one-handed operation, easier access to the cooking cavity, and convenient food placement, promoting the French doors as a unique selling point.[34]  However, at no point did the advertisement mention the risk of the doors suddenly and forcefully closing, potentially shattering, melting, or exploding, due to the Safety Defect. Instead, the segment conveyed a message of safety and ease of use, which contradicted the serious hazard now identified in the Recall.

63.     Defendants' consumer-facing advertising for the Defective Products was misleading, creating a false sense of safety and easy use. The company

---

[34]  QVCtv, Oster XL Digital Convection Oven w/ French Doors on QVC, at 3:39, 5:16 and 10:58 (YouTube May 29, 2029), https://www.youtube.com/watch?v=0cgBWUfvDWs (last visited Oct. 13, 2025).

27

highlighted the door mechanism as a benefit, while knowingly hiding the risk of the Safety Defect. The Ovens' product page, instruction manual, labeling, and packaging are devoid of any warning disclosing the risk that doors of the Ovens can abruptly and forcefully shut, melt, shatter, and explode due to the Safety Defect. Defendants' omission creates a serious, foreseeable hazard and danger, showing a reckless disregard for consumer safety.[35] These deceptive practices misled consumers and induced them to purchase a Defective Product that Defendants knew posed an unreasonable danger to their users and was not fit for its intended purpose.

64. In the United States, household countertop ovens must comply with safety standards like UL 1026[36] (Underwriters Laboratories Standard for Electric Household Cooking and Food Serving Appliances) and UL 858[37] (Underwriters Laboratories Standard for Household Electric Range). These standards ensure designs that reduce burn risks and mechanical hazards during normal use.

---

[35] *See* Oster®, *Oster® Manual French Door Air Fry Oven*, *supra* note 6.

[36] UL Standards & Engagement, *UL 1026 Household Electric Cooking and Food Serving Appliances*, https://www.shopulstandards.com/ProductDetail.aspx (last visited Oct. 12, 2025).

[37] Intertek, *SUN-UL 858, Household Electric Ranges Standard for Safety* (Apr. 4, 2019), https://www.intertek.com/standards-updates/ul-858-standard-for-safety-for-household-electric-ranges/; UL Standards & Engagement, *UL 858 Household Electric Ranges*, https://www.shopulstandards.com/ProductDetail.aspx (last visited Oct. 12, 2025).

65.     Defendants marketed themselves as a trusted manufacturer of premium kitchen appliances, particularly their ovens, which stood out from lower-cost options by lesser-known brands. Defendants highlighted features like the "French door" design, one-handed operation, and ease of access, promoting the ovens as safe and convenient.[38] Consumers justifiably relied on Defendants' representations regarding the Oven's adherence to stringent safety and testing standards, as the Ovens carry the UL symbol indicating compliance with UL standards. *See* Figure 14 below.



*Figure 14: Oster Ovens Product Label[39]*

---

[38] Oster®, *Product Description,* https://www.oster.com/cooking-appliances/countertop-ovens/oster-manual-french-door-air-fry-oven/SAP_2142004.html (last visited Oct. 20, 2025) (representing that the french door design "mak[es] inserting and removing meals easy and convenient").

[39] Oster®, *Product Reviews,* https://www.oster.com/cooking-appliances/countertop-ovens/oster-manual-french-door-air-fry-oven/SAP_2142004.html (last visited Oct. 20, 2025).

66.     Defendants' marketing explicitly emphasized the benefits of the French doors' one-handed opening, easy access to the cooking cavity, and the ease and convenience of placing and removing food while the French doors operated smoothly.[40] Defendants' statements gave consumers the reasonable but incorrect impression that the Ovens were meticulously engineered and rigorously tested for safe household use.

67.     Defendants' misrepresentations encouraged and caused consumers – including Plaintiff – to pay more for the Defective Products than they would have. Indeed, Defendants represented that they "hold rigorous standards in product design and testing."[41] Defendants' misrepresentations thus led consumers to rely on both the safety and convenience assurances of quality and protection that Defendants claimed to uphold. Had Plaintiff and the Class known the truth – that the Ovens contained a material Safety Defect that rendered them unusable – they would not have purchased the Ovens at all.

68.     Defendants' assertions influenced consumer decision-making by leading consumers to believe that their products were safe and more reliable, when the Ovens actually posed a serious danger and risk of harm to the user, as confirmed

---

[40]   QVCtv, at 5:00 and 10:58, *supra* note 27.

[41]   *Supra* note 8.

by Oster's own recall[42] notice – issued by Sunbeam further to the nationwide CPSC Recall – which was implemented after reports of serious and severe injuries.

**D.     Defendants' False and Misleading Representations Have Harmed Plaintiff and Class Members**

69.     Defendants knew, or should have known, that their marketing, advertising, and labeling on or about the Defective Products were false and misleading.

70.     Unfortunately, this is part of a pattern. Prior to the Recall that is the subject of this complaint, Defendants sold other products that were subject to nationwide recalls.

71.     For example, in May of 2014, Defendants recalled Holmes Ceramic Heaters, which tended to "overheat, posing a fire hazard to consumers."[43]

72.     More recently, in March of 2023, Defendants recalled "about 43,000" Queen sized Heated Blankets "[d]ue to [b]urn and [f]ire [h]azards." Defendants recognized that the "heated blankets can overheat, posing fire and burn hazards."[44]

---

[42]  *See id.*

[43]  U.S. Consumer Product Safety Commission, *Sunbeam Recalls Holmes Ceramic Heaters*, https://www.cpsc.gov/Recalls/2014/Sunbeam-Recalls-Holmes-Ceramic-Heaters (last visited Oct 13, 2025).

[44]  Div. of Homeland Security and Emergency Services, *Sunbeam Heated Blankets Recalled Due to Burn and Fire Hazards; Distributed by Star Elite*, https://www.dhses.ny.gov/sunbeam-heated-blankets-recalled-due-burn-and-fire-hazards-distributed-star-elite (last visited Oct. 12, 2025).

73. In other words, Defendants knew, or should have known, that their products may be unsafe and pose a danger and required the utmost safety design, testing, and inspections.

74. Defendants' marketing materials boasted the Oven's "single-pull French doors" as being "easy and convenient."[45] But these representations were misleading because they critically omitted the material fact that the doors were unsafe and could abruptly snap shut, shatter, melt, or even explode, resulting in harm to consumers.

75. Defendants knew, or should have known, that their advertising for the Defective Products omitted material facts concerning safety and misrepresented the Ovens as being safe, easy, and convenient when they were not.

76. Defendants knew, or should have known, that the claims and statements presented in their labeling and advertising would deceive consumers into choosing the Defective Products over alternatives from competitors, under the false impression that the Defective Products were safe and usable as stovetop ovens in household kitchens.

77. Had Defendants disclosed the Safety Defect present in the Defective Products and accurately labeled with full disclosure the dangers and safety risks

---

[45] Oster®, *Oster® Manual French Door Air Fry Oven*, *supra* note 6.

related to the Ovens' ordinary use, Plaintiff and the Class would not have purchased the Defective Products.

**E.      The Defective Products Have Been Recalled And The Recall Is Ineffective and Inadequate**

78.      On September 25, 2025, Defendants announced a Recall of approximately 1,290,000 Defective Products.[46]  The Recall was issued after almost 100 incidents were reported, some of which included explosions and fires, and others included burn injuries, some as serious as second-degree. As a result, the CPSC determined that the Ovens posed a significant danger and risk of burn injury to users and instructed Consumers to "immediately stop using the recalled countertop ovens."[47]

79.      Defendants have also instructed their consumers to discontinue use of the recalled countertop ovens and to contact Defendants through their "Support Page" to receive a repair kit.[48] *See* Figure 15 below.

---

[46]   Oster®, *supra* note 11.

[47]   *Id*; *see also* U.S. Consumer Product Safety Comm'n, *supra* note 1.

[48]    Oster®, *supra* note 11.

33



**Important Safety Notice**

**Voluntary Recall: Oster French Door Countertop Oven**

Oster is voluntarily recalling select models of our French Door Countertop Ovens across the United States and Canada. This recall was initiated on September 25, 2025, in partnership with the U.S. Consumer Product Safety Commission and Health Canada. The recall is being announced because the doors can close on consumers, posing a burn hazard.

We're providing a free repair kit with a clip-on device that helps keep the oven doors securely open during use. The clip-on device is offered to consumers at no cost, and the repair kit does not require any installation tools.

At Oster, we hold rigorous standards in product design and testing and have carefully investigated reports of the product's doors closing unexpectedly during use. Sunbeam Products Inc. has received 95 reports of the doors unexpectedly closing, resulting in burn injuries to consumers, including two reports of second-degree burns.

**Recall Summary**

**Injuries Reported:** 95

**Number of Units Affected:** 1.29 million (104,195 were sold in Canada)

**Dates Sold:** August 2015 to July 2025

**SKU Numbers:** TSSTTVFDXL, TSSTTVFDDG, TSSTTVFDMAF, TSSTTVFDDGDS, TSSTTVFDDAF-033, TSSTTVFDXLPP-033, and TSSTTVFDDAF

**MSRP:** $140-$250

**Markets Sold:** United States and Canada

*Figure 15: Oster Important Safety Notice & Recall*[49]

80. In its notice of recall, Defendants direct consumers to contact them for a Door Assist Magnet repair kit. However, the Recall does not offer adequate reimbursement for the premium prices consumers paid because of Sunbeam's misrepresentations. Due to the malfunctioning characteristics of the doors, many consumers may have already replaced or disposed of the Defective Products because of the serious risks they pose.

81. The Recall does not provide consumers with an option to receive a cash refund; it only provides a repair kit from a company that consumers may

---

[49] *Id.*

(reasonably) no longer trust – a kit that is not even available as of the date of filing this complaint. In addition, consumers might not know how to install the repair kit, and it may not effectively resolve the issue of French doors unexpectedly slamming shut, melting, shattering, or exploding, thus doing nothing to eliminate the danger posed by the Defective Products.

## TOLLING

82. Defendants have known of the Safety Defect since at least 2022, and they have concealed, or failed to disclose or to notify the Plaintiff, Class members, and the public of the full and complete nature of the Safety Defect. Even when faced with a full product Recall, Defendants continue to downplay the dangers associated with the Defective Product.[50]

83. Any applicable statutes of limitations related to Plaintiff's and Class members' claims were tolled by Defendants' knowing concealment and ongoing conduct, which Plaintiff and Class Members could not have discovered through diligent investigation, thus delaying discovery of their claims.

84. Defendants were, and are, under a continuous duty to disclose to the Plaintiff, the Class members, and the public about the true quality, character, and nature of the Ovens. Instead, Defendants actively concealed or omitted the Safety Defect from its messaging, knowingly made misrepresentations about the quality,

---

[50] *See* Oster®, *supra* note 11.

safety, and convenience of the Ovens, and downplayed the true hazardous nature of the Defective Products. Plaintiff and Class members reasonably relied on Defendants' marketing, advertising, and other affirmative representations and/or active concealment of the inherent danger posed by the Defective Products. Thus, Defendants are estopped from relying on any statutes of limitation to defend themselves from this action.

85.     As detailed above, Plaintiff and Class members did not know, and could not have known, that the Defective Products contained a Safety Defect that rendered the Ovens unusable and hazardous, and their legal claims did not begin to accrue until they discovered the Safety Defect.

**CLASS ACTION ALLEGATIONS**

86.     Plaintiff brings this action pursuant to Rule 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, on behalf of herself and members of Nationwide and Ohio Classes, defined as:

> **Nationwide Class:** All persons who purchased one or more of Defendants' Defective Products in the United States for personal/household use and not for resale, within the fullest period allowed by law (the "Nationwide Class").

> **Ohio Class**: All persons who purchased one or more of Defendants' Defective Products in the state of Ohio for personal/household use and not for resale, within the fullest period allowed by law (the "Ohio Class").

87.     Subject to additional information that may be obtained through discovery and further investigation, the foregoing class definitions may be modified

36

by amendment or in the motion for class certification, including using multi-state subclasses to account for material differences in state laws, if any are applicable. Fed. R. Civ. P. 23 (c)(1)(C).

88. Excluded from the Nationwide Class and Ohio Class are: (a) Defendants and their subsidiaries, parents, successors, and predecessors, any entities in which Defendants or its parents a have a controlling interest, and Defendants' current or former employees, officers, directors, legal representatives, heirs, and successors; (b) Class Counsel and their employees; and (c) the judicial officers presiding over this action and any members of their families and associated court staff assigned to this case.

89. Plaintiff seeks economic damages and equitable relief for herself and the putative Classes. Excluded from class treatment are any claims for personal injuries, wrongful death, or emotional distress.

90. Certifying the Plaintiff's claims for class-wide treatment is appropriate as Plaintiff can prove elements of her claims on a classwide basis, using the same evidence that would be used to prove those elements in individual actions alleging the same claims against Defendants.

91. This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Fed. R. Civ. P. 23.

92. **Numerosity (Rule 23(a)(1))**: The members of the Classes are so numerous and dispersed the joinder of all Class members is impractical. While Plaintiff is informed and believes that there are tens of thousands, if not hundreds of thousands, of Class members, given that 1.29 million units were subject to the Recall, the exact number of Class members is unknown. The exact number and identity of Class members may be ascertained from Defendants' or its authorized retailers' records.

93. **Commonality and Predominance (Rules 23(a)(2) and (b)(3))**: This action presents common questions of law and fact, and those questions are subject to classwide proof and predominate over any questions that may affect individual Class members. The common factual and legal questions include, but are not limited to:

(a) Whether the Defective Products contain the Safety Defect alleged herein;

(b) Whether the Defendants knew, or should have known, of the Safety Defect and when, prior to the Recall;

(c) Whether the Defendants had a duty to disclose the Safety Defect to their consumers prior to the Recall;

(d) Whether Defendants violated the Ohio Consumer Sales Practices Act, as alleged herein;

38

(e)     Whether Defendants failed to adequately warn Plaintiff and the Class members that the Defective Products had the Safety Defect and of the corresponding risk of harm;

(f)     Whether Defendants' marketing, advertising, packaging, and labeling of the Defective Products were false, misleading, or deceptive;

(g)     Whether Defendants' marketing omitted or failed to disclose material information to the Plaintiff and the Class members regarding the Defective Products;

(h)     Whether Defendants concealed, omitted, or failed to disclose to Plaintiff and the Class members that the Defective Products contain the Safety Defect;

(i)     Whether Plaintiff and Class members suffered an ascertainable loss of monies or other value because of Defendants' misconduct, misrepresentations, or acts and omissions of material facts;

(j)     Whether Plaintiff and Class members are entitled to monetary damages, and if so, the nature of any such relief;

(k)     Whether Defendants were unjustly enriched at the expense of the Plaintiff and Class members in connection with selling the Defective Products;

(l)     Whether Plaintiff and Class members are entitled to restitution and non-restitutionary disgorgement.

94. These same common issues may be properly certified for class treatment under Rule 23(c)(4) of the Federal Rule of Civil Procedure.

95. **Typicality (Rule 23(a)(3)):** Plaintiff's claims are typical of the claims of the Class because Plaintiff, like all other Class members, purchased one of the Defective Products, each with an identical Safety Defect, and sustained damages as a result of Defendants' uniform misconduct, and because Plaintiff seeks the same relief as the proposed Class Members.

96. **Adequacy (Rule 23(a)(4))**: Plaintiff will fairly and adequately protect and represent the Class; her interests do not conflict with and are not antagonistic to the interests of any other Class members. The Plaintiff has also retained experienced and competent legal counsel that is highly skilled in complex class actions and consumer litigation. Plaintiff and her counsel will fairly and adequately advocate to safeguard the interests of the Class members.

97. **Superiority (Rule 23(b)(3))**: A class action is superior to other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. It would be impractical for Class members to individually litigate their own claims against Defendants because the damages suffered by the Plaintiff and Class members are relatively minor compared to the burden and expense that would be required to individually litigate their claims against Defendants. Even if Class

40

members could afford individual litigation, it would create the potential for inconsistent or contradictory judgments, as well as increased delay and expenses for the court system. In contrast, a class action provides an efficient means for adjudication with fewer management difficulties and comprehensive supervision by a single court.

98.     **Ascertainability:** The Class is defined by reference to objective criteria, and there are feasible mechanisms to determine who fits within the Class.

99.     **Injunctive Relief (Rule 23(b)(2)):** Defendants have acted or refused to act on grounds generally applicable to the Plaintiff and to all Class members, thereby making appropriate identical injunctive relief with respect to the Class as a whole.

**CAUSES OF ACTION**

**COUNT I**

**Violation of The Ohio Consumer Sales Practices Act,**
**Ohio Rev. Code. §§ 1345.01,** *et seq.*
**(On Behalf of Plaintiff and the Ohio Class)**

100.    Plaintiff incorporates and re-alleges paragraphs 1 through 99, as though fully set forth herein.

101.    The Ohio Consumer Sales Practices Act ("OCSPA") prohibits "supplier[s] from commit[ting] an unfair or deceptive act or practice in connection with a consumer transaction." Noting that "[s]uch an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Ohio Rev. Code. § 1345.02(A).

41

102. Plaintiff and Ohio Class members are "consumers" as they are "person(s) who engage(s) in a consumer transaction with a supplier as defined by the OSCPA. Ohio Rev. Code. § 1345.01(D). "Consumer transaction" is defined as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." Ohio Rev. Code. § 1345.01(A).

103. Defendants are "Supplier(s)" as they "engage[] in the business of effecting or soliciting consumer transactions" as defined by OCSPA, directing their activities to the people of Ohio. *See* Ohio Rev. Code. § 1345.01(C).

104. Defendants engaged in unfair and deceptive acts in connection with consumer transactions, in violation of Ohio Rev. Code. § 1345.02(A). Defendants also acted unfairly and deceptively when they represented that their products were of a "particular standard, quality, [or] grade" when they were not, in violation of Ohio Rev. Code. § 1345.02(B).[51]

105. Defendants, directly or through their agents, authorized retailers, employees, and/or subsidiaries, violated the OCSPA by knowingly and intentionally

---

[51] "(B) Without limiting the scope of division (A) of this section, the act or practice of a supplier in representing any of the following is deceptive:[. . . ](2) That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not." Ohio Rev. Code. § 1345.02(B).

misrepresenting, omitting, concealing, or failing to disclose material facts regarding the Defective Products. This includes that the Defective Products had a Safety Defect, were not safe and were, in fact, unreasonably dangerous, posed a hazard to users, and were unfit for their intended purpose, as described herein.

106.   Defendants knowingly advertised, marketed, and distributed point of sale materials that represented the Ovens' French door design as a feature that would allow for easy access by opening with a single pull. Defendants' representations were false and misleading because they omitted the material fact that the doors could get stuck and unexpectedly close, create a burning hazard upon contact, and could shatter or even explode, posing a fire hazard to a user's home. A reasonable consumer would have found that information material when considering whether to purchase the Defective Product.

107.   By knowingly and intentionally misrepresenting, omitting, concealing, and failing to disclose these material facts regarding the Defective Products – specifically, that these Defective Products contained the Safety Defect, were not reasonably safe, were unreasonably dangerous and were not suitable for their intended purpose – Defendants engaged in one or more unfair or deceptive acts or practices in connection with a consumer transaction, in violation of the OSCPA.

108. Defendants' misrepresentations, omissions, concealments, and failures to disclose were material because they were likely to and did deceive reasonable consumers.

109. Defendants uniformly made misrepresentations, omissions, concealments, and suppressions in connection with the sale of the Defective Products, and failed to disclose the Safety Defect – *i.e.*, the defective and unreasonably dangerous nature of the Defective Products – to Plaintiff and Ohio Class members.

110. Defendants knew that their misrepresentations, omissions, concealments, and failures to disclose were material to consumers. The safety and reliability of a manufacturer's products, as well as the manufacturer's commitment to stand behind its products, are material concerns for consumers.

111. Defendants engaged in unfair and deceptive acts or practices in the sale of the Defective Products, including misrepresenting, concealing, suppressing, and omitting material facts. These actions had the tendency and potential to mislead, and did mislead, consumers, creating a false impression in their minds that the Defective Products were safe, easy, and convenient and appropriate for their intended use. As a result, reasonable consumers, including the Plaintiff and Ohio Class members, were likely to be, and indeed were, deceived about the defective and unreasonably dangerous nature of the Defective Products, which were and are unusable.

112. Defendants intended that their misrepresentations, omissions, concealments, suppressions, and failures to disclose material facts would encourage and lead Plaintiff and the Ohio Class to purchase the Defective Products.

113. Defendants made misrepresentations, omissions, concealments, suppressions, and failed to disclose material facts to Plaintiff and the Ohio Class, who were injured at point-of-sale each time they purchased a Defective Product.

114. Plaintiff and the Ohio Class reasonably relied on the misrepresentations, omissions, concealments, suppressions, and failures to disclose material facts regarding the Defective Products, as described herein.

115. If Defendants had accurately marketed, advertised, packaged, labeled, and sold the Defective Products, then Plaintiff and the Ohio Class would not have purchased them, or would not have paid as much for the Defective Products as they did.

116. Defendants specifically boasted how the French oven doors, featured in the Defective Products, made cooking "easy and convenient" and that the "elegant French Doors open with a single pull, making it easy to insert and remove food."

117. These representations are contrary to the true nature of the Safety Defect, which makes opening the French doors unsafe and dangerous and unusable and which prompted Defendants to issue a Recall instructing consumers to "immediately" stop use of the Defective Products.

45

118. Defendants failed to disclose the Safety Defect to consumers in their advertising and marketing, website, product packaging, labeling, and user manuals.

119. Plaintiff and the Ohio Class were unaware of the Safety Defect in the Defective Products, and Plaintiff and the Ohio Class could not have discovered these concealed facts through a diligent investigation.

120. Plaintiff and the Ohio Class acted reasonably in relying on Defendants' representations and omissions, the truth of which they could not have discovered even through a reasonable investigation.

121. As a direct and proximate result of the Defendants' deceptive actions and practices, Plaintiff and the Ohio Class have suffered and will continue to suffer harm, including ascertainable, and nominal damages. This includes the lost expected benefit of the bargain from purchasing the Defective Products, overpayment for the Defective Products, and the entire loss of purchase price for Defective Products that are worthless.

122. Defendants' violations present a continuing risk of harm to Plaintiff and the Ohio Class members, as well as to the general public. Defendants' deceptive acts and practices as detailed in this Complaint affect the public interest.

123. As a result of Defendants' violations of the OCSPA, Plaintiff and Ohio Class members seek all monetary and nonmonetary relief allowed by law, including actual or nominal damages under Ohio Rev. Code §§1345.09(A), 1345.09(B), and

46

1345.09(G); injunctive relief Ohio Rev. Code. § 1345.09(D); and reasonable attorneys' fees and costs, under Ohio Rev. Code. § 1345.09(F); along with any other relief that is just and proper.

**COUNT II**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Nationwide Class and,**
**alternatively, the Ohio Class)**

124. Plaintiff incorporates and re-alleges paragraphs 1 through 99, as though fully set forth herein.

125. Plaintiff brings this cause of action individually and on behalf of all other class members.

126. To the extent required, Plaintiff asserts this cause of action in the alternative to legal claims, as permitted by Rule 8 of the Federal Rules of Civil Procedure.

127. Plaintiff and the Class members conferred a benefit upon Defendants through the gross revenues that Defendants obtained from the sale of Defective Products.

128. Defendants were aware of and enjoyed the significant benefit conferred upon them by Plaintiff and the Class members.

129. Defendants were unjustly enriched by retaining the revenues generated from Plaintiff's and the class members' purchases of the Defective Products, which retention of such funds is unjust and inequitable because Defendants failed to

47

disclose or omitted that the Defective Products were dangerous or neglected to correct the Safety Defect by providing refunds, or replacing the Defective Products. As a result, Plaintiff and Class members suffered injuries they would not have purchased the Defective Products or would have paid a lower price if they had known the true facts concerning the Defective Products and the Safety Defect.

130. Defendants accepted and retained the benefits from the gross revenues generated from the sales of the Defective Products.

131. Defendants profited by retaining the benefit under circumstances that would make it unjust for Defendants to retain the benefit.

132. As a direct and proximate result of Defendants' actions, Plaintiff and Class members suffered losses in an amount to be proven at trial.

133. Plaintiff and Class members experienced actual injuries-in-fact and incurred financial losses because of Defendants' unjust conduct.

134. Plaintiff and Class members do not have an adequate legal remedy for this claim and are entitled to both restitution of monies paid and non-restitutionary disgorgement of the financial profits that the Defendants gained from their unjust conduct.

**COUNT III**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Nationwide Class and,**
**alternatively, the Ohio Class)**

135. Plaintiff incorporates and re-alleges paragraphs 1 through 99, as though fully set forth herein.

136. Defendants owed Plaintiff and the Class a duty to exercise reasonable care in the design, testing, manufacture, instructions, and warnings for their Defective Products, including a post-sale duty to take reasonable steps once hazards became known.

137. Defendants breached these duties by, among other things: (a) adopting a one-handed French door layout that invites hand placement at the hot door edge without adequate hold-open, damping, or guarding; (b) failing to conduct or act on reasonable testing; (c) failing to provide adequate pre-sale warnings and instructions regarding swing-shut and safe hand placement; and (d) failing, post-sale, to timely warn prior purchasers, issue corrective instructions, or implement a prompt repair/retrofit after receiving consumer complaints and reports of the fire hazard and risk of injury.

138. The risks of sudden door closure and contact with heated door edges were foreseeable to Defendants, and safer, feasible alternatives and precautions were available at reasonable cost, including: (a) enhanced magnetic locks to hold the doors either securely open or securely closed; (b) mechanisms to hold the doors at

49

partially open positions; (c) sturdy hinge mechanisms that would prevent the doors from snapping or slamming shut; (d) mechanisms that required dual handle use to avoid one-handed operation; (e) heat-insulating or edge-guarding of the glass doors to avoid or minimize contact with hot surfaces; and (f) clear and prominent warning labels on the Ovens, their packaging, and manuals.

139. Defendants' negligence was a substantial factor in causing Plaintiff and the Class members to purchase the Defective Products, which are unsafe and pose a fire hazard and risk of injury to their users during ordinary and intended use rendering them unusable and valueless. Such harm was a foreseeable consequence of this conduct.

140. As a direct and proximate result, Plaintiff and the Class members sustained injuries and damages, including loss of use, out-of-pocket losses, and diminution in value.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and the proposed Classes, pray for relief and judgment against Defendants in an order:

A. Certifying the Classes pursuant to Rule 23 of the Federal Rules of Civil Procedure, appointing Plaintiff as the representative of the Nationwide Class and Ohio Class, and appointing Plaintiff's counsel as Class Counsel;

B.  Declaring Defendants' conduct violates the OCSPA and finding in favor of Plaintiff and Class members on all counts asserted herein;

C.  Awarding Plaintiff and the Classes actual, nominal, and/or punitive damages in an amount to be determined by the trier-of-fact;

D.  Awarding disgorgement and restitution of monies received from Plaintiff and Class members because of the defective and misrepresented products;

E.  Entering preliminary and permanent injunctive relief, requiring Defendants to implement a court-supervised collection and product destruction program for all Defective Products, and/or directing Defendants to cure the inadequate recall and notice process;

F.  Enjoining Defendants from continuing to engage in the wrongful acts and practices alleged herein;

G.  Providing for all other injunctive and equitable relief deemed necessary by the Court;

H.  Awarding Plaintiff and the Classes reasonable attorneys' fees, expenses, and costs as allowable by law;

I.  Awarding pre-judgment and post-judgment interest; and

J.  Granting any other relief as this Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury of all claims so triable.

51

Dated: October 23, 2025.

/s/ T. Brandon Waddell
Michael A. Caplan (GA Bar 601039)
T. Brandon Waddell (GA Bar 252639)
**CAPLAN COBB LLC**
75 Fourteenth Street NE, Suite 2700
Atlanta, Georgia 30309
Tel: (404) 596-5600
Fax: (404) 596-5604
mcaplan@caplancobb.com

Mark J. Dearman*
Dorothy P. Antullis*
Nicolle B. Brito*
Anny M. Martin*
**ROBBINS GELLER RUDMAN
 & DOWD LLP**
225 NE Mizner Boulevard, Suite 720
Boca Raton, Florida 33432
Telephone:  561/750-3000
Fax:  561/750-3364
mdearman@rgrdlaw.com
dantullis@rgrdlaw.com
nbrito@rgrdlaw.com
amartin@rgrdlaw.com

James E. Cecchi*
Jason H. Alperstein*
**CARELLA, BYRNE, CECCHI,
 BRODY & AGNELLO, P.C.**
5 Becker Farm Road
Roseland, New Jersey 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
jcecchi@carellabyrne.com
jalperstein@carelleabyrne.com

*Counsel for Plaintiff and the putative
Classes*

\* *Pro hac vice* applications forthcoming

52